UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW WARD,<br><br>                     Plaintiff,<br><br>     -against-<br><br>SWITCHBACK ENERGY ACQUISITION CORPORATION, SCOTT MCNEILL, JIM MUTRIE, ZANE ARROTT, JOSEPH ARMES, RAY KUBIS, CHRIS CARTER, SCOTT GIESELMAN, and SAM STOUTNER,<br><br>                     Defendants. | Case No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Matthew Ward ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought by Plaintiff against Switchback Energy Acquisition Corporation ("Switchback" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Switchback, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the proposed merger (the "Proposed Merger") between Switchback and ChargePoint, Inc. ("ChargePoint"). Plaintiff also asserts a claim against the Individual Defendants for breaching their fiduciary duty of candor/disclosure under state law.

2.      On September 23, 2020, Switchback entered into an a business combination agreement and plan of reorganization (the "Merger Agreement"), pursuant to which each

1

outstanding share of ChargePoint common stock will be cancelled and automatically converted into the right to receive (a) the number of shares of Class A common stock of Switchback equal to the exchange ratio (determined in accordance with the Merger Agreement) and (b) the contingent right to receive certain earnout shares (the "Merger Consideration"). The Combined Company will be renamed ChargePoint Holdings, Inc. and continue to trade on the New York Stock Exchange. After the closing of the Proposed Merger, Switchback's current common stockholders will only retain an ownership interest between 4.1% and 14.5% in the post-combination company.

3. On December 4, 2020, in order to convince Switchback shareholders to vote in favor of the Proposed Merger, Defendants authorized the filing of a materially incomplete and misleading proxy statement/consent solicitation statement/prospectus on Form S-4 (the "Proxy") with the SEC in violation of Sections 14(a) and 20(a) of the Exchange Act and in breach of the Individual Defendants' duty of disclosure.

4. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the conflicts of interest facing the financial advisors employed during the sales process including, Goldman Sachs & Co. LLC ("Goldman Sachs") and BofA Securities, Inc. ("BofA"); (ii) the valuation analyses performed by the financial advisors and/or the companies; (iii) ChargePoint's financial projections; the (iv) the confidentiality agreements executed during the sales process.

5. The special meeting of Switchback shareholders to vote on the Proposed Merger is forthcoming (the "Shareholder Vote"). It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote so Plaintiff can cast an informed vote and properly exercise his corporate suffrage rights.

6. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against

Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and breach of the duty of disclosure. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Merger until the material information discussed herein is disclosed to Switchback's shareholders sufficiently in advance of the Shareholder Vote or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act and breach of the duty of disclosure.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

8. The Court has supplemental jurisdiction over the state law claim for breach of the duty of candor/disclosure pursuant to 28 U.S.C. § 1367.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman* 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* At 1316

10. Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C.

§ 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Switchback's common stock trades on New York Stock Exchange, which is headquartered in this District, and Switchback hired Goldman Sachs as an advisor in connection with the Proposed Merger, also headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11. Plaintiff is, and at all relevant times has been, a holder of Switchback common stock.

12. Defendant Switchback is a blank check company formed to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination involving Switchback and one or more businesses. The Company is a Delaware corporation with its principal executive office located at 949 Sherry Lane, Suite 1010, Dallas, TX 75225. The Company's common stock trades on the NYSE under the ticker symbol "SBE".

13. Individual Defendant Scott McNeill has been the Chief Executive Officer, the Chief Financial Officer, and a director of the Company at all relevant times.

14. Individual Defendant Jim Mutrie has been the Chief Commercial Officer, General Counsel, Secretary, and a director of the Company at all relevant times.

15. Individual Defendant Zane Arrott has served as director of the Company at all relevant times.

16. Individual Defendant Joseph Armes has served as director of the Company at all relevant times.

17. Individual Defendant Ray Kubis has served as director of the Company at all relevant times.

18. Individual Defendant Chris Carter has served as director of the Company at all relevant times.

19. Individual Defendant Scott Gieselman has served as director of the Company at all relevant times.

20. Individual Defendant Sam Stoutner has served as director of the Company at all relevant times

21. The Individual Defendants referred to in ¶¶ 13-20 are collectively referred to herein as the "Individual Defendants" and/or the "Board", and together with Switchback they are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

I. **Background and the Proposed Merger**

22. Switchback is a blank check company. The Company is formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. The Company intends to acquire and operate a business in the energy industry in North America.

23. ChargePoint designs, develops and markets networked electric vehicle charging system infrastructure and cloud-based services which enable consumers the ability to locate, reserve, authenticate and transact EV charging sessions. It provides an open platform that integrates with system hardware from ChargePoint and multiple other manufacturers, connecting systems over an intelligent network that provides real-time information about charging sessions. This network provides multiple web-based portals for charging system owners, fleet managers, drivers and utilities. ChargePoint generates revenue primarily through the sale of networked charging systems, Cloud Services and Assure, which are typically paid for upfront. Assure also

5

includes proactive monitoring, fast response times, parts and labor warranty, expert advice and robust reporting. The ChargePoint CPaaS program combines the customer's use of ChargePoint's owned and operated systems with Cloud Services, Assure and other benefits available to subscribers into one subscription.

24.     On September 24, 2020, Switchback and ChargePoint issued a joint press release announcing the Proposed Merger, which states in relevant part:

> **ChargePoint, Inc. to Become Public Company, Advancing EV Charging Network's Reach Across North America and Europe**
>
> ***Business Combination with Switchback Energy Acquisition Corporation Valued at $2.4 Billion***
>
> - *Public listing milestone broadens market leadership and builds on over a decade of innovation with more than 4,000 businesses and organizations participating in ChargePoint's new fueling network*
>
> - *Approximately $493 million in net proceeds will advance ChargePoint, Inc.'s commercial, fleet and residential businesses*
>
> - *Transaction includes $225 million upsized PIPE at $10.00 per share anchored by institutional investors, including Baillie Gifford and funds managed by Neuberger Berman Alternatives Advisors*
>
> - *ChargePoint President and CEO Pasquale Romano and existing leadership team to lead combined company*
>
> - *Investor call scheduled for Thursday, September 24, 2020 at 8:30am ET*
>
> Campbell, Calif. & Dallas, Texas – September 24, 2020 – ChargePoint, Inc., (the "Company" or "ChargePoint") a leading electric vehicle ("EV") charging network, and Switchback Energy Acquisition Corporation (NYSE: SBE) ("Switchback"), a publicly traded special purpose acquisition company with a strategic focus on the energy sector, today announced the signing of a definitive business combination agreement. ChargePoint expects to use transaction proceeds to expand its reach in North America and Europe, further enhance its technology portfolio and significantly scale its commercial, fleet and residential businesses ahead of the anticipated introduction of an increasing number of new EV models and rising EV penetration.
>
> "For thirteen years we have been singularly focused on our vision to move all

people and goods on electricity, and that has never been more relevant than it is today," said Pasquale Romano, President and CEO, ChargePoint. "We've pioneered networked charging and are resolute in our aim to usher in the transition to mass EV adoption by electrifying one parking spot at a time. Today, we are a charging market leader thanks to a winning business model, a complete portfolio and thousands of brands that have realized that EV charging is essential, good for business and aligned with their corporate and sustainability goals. Our technology charges all EVs – from passenger vehicles to delivery fleets – so there is no need to choose winners in electric mobility. We see ourselves as an index for the entire category."

Scott McNeill, CEO, CFO and Director of Switchback said, "The EV charging industry is accelerating and it is expected that charging infrastructure investment will be $190 billion by 20301. As a first mover in the space, ChargePoint has distinguished itself as the number one EV charging network and is well positioned to deliver mission-critical charging infrastructure as the expected transition to electric mobility accelerates. ChargePoint has a proven and capital-light business model that combines hardware and high-margin, recurring software subscriptions and services with extensive and strong customer relationships. As a result, we believe ChargePoint will continue to grow its strong market position as the EV industry evolves. Switchback and our investors are excited to partner with the talented ChargePoint team to advance their vision."

Founded in 2007, ChargePoint is a category creator in EV charging, helping to make the mass adoption of electric mobility a reality. It operates in every segment, from commercial to fleet to residential. ChargePoint has created one of the world's largest charging networks with a capital-light model by selling individual organizations and businesses, known as site hosts, everything they need to electrify their parking spaces – networked charging hardware, software subscriptions and associated support services. Charging is matched to parking duration, from energy-managed AC level 2 to DC fast charging. The parking spaces owned by ChargePoint's site hosts are seamlessly integrated into one network available to the driver in a top-rated mobile app. ChargePoint's winning operating model and high-quality solutions foster loyal site hosts who expand their charging footprint as EV penetration rises, creating a virtuous loop of brand awareness, satisfied drivers, organic networked charging hardware and recurring SaaS revenue.

ChargePoint serves customers through its software-defined hardware portfolio, comprehensive suite of software solutions and robust network and services designed for a wide range of use cases. ChargePoint's offerings have attracted a growing customer base of more than 4,000 organizations and businesses, building a network of more than 115,000 public and private places to charge. ChargePoint also offers access to an additional 133,000 public places to charge through network roaming integrations across North America and Europe. Drivers plug into the ChargePoint network approximately every two seconds and have completed more than 82 million charging sessions to date.

Upon the transaction closing, ChargePoint will continue to be led by President and CEO, Pasquale Romano and the existing management team. Romano brings more than 30 years of executive leadership experience with technology companies including 2Wire, Inc. and Polycom, Inc. During Romano's nearly ten-year tenure at ChargePoint, it has emerged as a leading EV charging network.

**Transaction Overview**

The business combination values ChargePoint at an implied $2.4 billion enterprise value. Upon transaction closing, and assuming no redemptions by Switchback stockholders, ChargePoint will have approximately $683 million in cash, resulting in a total pro forma equity value of approximately $3.0 billion. Cash proceeds raised in the transaction will be used to repay debt, fund operations, support growth and for general corporate purposes. The proceeds will be funded through a combination of Switchback's approximately $317 million cash in trust, assuming no redemptions by Switchback stockholders, and a $225 million PIPE of common stock valued at $10.00 per share led by institutional investors including Baillie Gifford and funds managed by Neuberger Berman Alternatives Advisors. In addition, Switchback's sponsor and certain other of its founder stockholders have agreed that a portion of their equity will vest only if following the closing the share price of ChargePoint exceeds $12.00 per share for any ten trading days within any twenty consecutive trading day period prior to the fifth anniversary of the closing of the transaction.

Upon the transaction closing, the combined company will be named ChargePoint Holdings, Inc. and will be listed on the New York Stock Exchange (the "NYSE").

The boards of directors of both Switchback and ChargePoint have unanimously approved the proposed transaction. The closing is subject to the approval of ChargePoint's stockholders and Switchback's stockholders and other customary closing conditions, including Switchback's registration statement being declared effective by the Securities and Exchange Commission (the "SEC") and the expiration of the HSR Act waiting period. It is currently anticipated that the transaction will close, assuming satisfaction of such closing conditions, by the end of the fourth quarter of 2020.

**Advisors**

BofA Securities is serving as exclusive financial advisor, Oppenheimer & Co. Inc. is serving as capital markets advisor, and Weil, Gotshal & Manges LLP and Gunderson Dettmer Stough Villeneuve Franklin & Hachigian LLP are serving as legal advisors to ChargePoint. Goldman Sachs & Co. LLC is serving as exclusive financial advisor and Vinson & Elkins L.L.P. is serving as legal advisor to Switchback. Goldman Sachs & Co. LLC is serving as lead placement agent with BofA Securities and Oppenheimer & Co. Inc. serving as co-placement agents on

the PIPE. Financial Profiles, Inc. is serving as investor relations advisor for ChargePoint.

## II.  The Proxy Omits Material Information

25. On December 4, 2020, Defendants filed the materially incomplete and misleading Proxy with the SEC. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision in connection with the Proposed Merger.

### A.  The Misleadingly Incomplete Information Regarding the Financial Advisors

26. The Proxy omits material information about the financial advisors, their relationships, and their roles in the events leading up to the Proposed Merger.

27. First, the Proxy states that Goldman Sachs acted both as an advisor for Switchback during the negotiation of the Proposed Merger and as the lead placement agent for subscription agreements of an aggregate of 22,500,000 shares of Switchback Class A common stock (the "PIPE Financing"). However, the Proxy fails to state the historical relationship between Goldman Sachs on the one hand, and the Company, the Individual Defendants, ChargePoint, or any affiliates thereof on the other, including all compensation received or expected to be received from any work performed. This includes historical compensation as well as the compensation they have received or expect to receive from acting as an advisor during the negotiation of the Proposed Merger and as lead placement agent for the PIPE Financing.

28. Second, the Proxy states that BofA acted both as the financial advisor for ChargePoint and a co-placement agent with Goldman Sachs in connection with the PIPE Financing, but the Proxy fails to state the compensation BofA received for acting as a financial

advisor for either party, or the historical relationships between BofA on the one hand, and the Company, the Individual Defendants, ChargePoint, or any affiliates thereof on the other.

29. It is important for shareholders to be able to understand what factors might influence a financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered when assessing how much credence to give its work or how much scrutiny to give the Proposed Merger. A reasonable shareholder would want to know what important economic motivations that the advisor might have.

30. The failure to include this material conflict of interest information renders the summaries of the financial advisors' work performed in the proxy misleadingly incomplete.

B. The Misleadingly Incomplete Valuation Information

31. ChargePoint management prepared 7 years of financial projections and supplied them to its board of directors and to Switchback. In connection with the Proposed Merger, Switchback management used these financial projections as part of its comprehensive analysis and presented key elements of the forecasts to the Switchback Board as part of the Board's review and subsequent approval of the Proposed Merger.

32. Moreover, the Proxy references multiple instances where the valuation of ChargePoint and/or the combined company was discussed, but fails to disclose any analyses performed by either company, Goldman Sachs, or BofA in support of its views on the valuation of the ChargePoint business either as a standalone or as implied by the terms of the potential business combination.

33. On July 16, 2020, Individual Defendants Mutrie and McNeill and Goldman Sachs discussed the frameworks for valuing ChargePoint and potential transaction structures for a business combination between ChargePoint and Switchback.

34. On August 11, 2020, Individual Defendants Mutrie and McNeill and Goldman Sachs reviewed an evaluation of ChargePoint's business model and valuation and conveyed their belief that a business combination with ChargePoint was the most attractive acquisition opportunity Switchback had evaluated.

35. On September 17, 2020, Goldman Sachs provided to the Switchback Board a review of the EV market opportunity and the proposed valuation for ChargePoint.

36. In reaching its decision to approve the Proposed Merger, the Switchback Board reviewed the results of the due diligence conducted by Switchback's management and Switchback's advisors, which included: meetings and calls with ChargePoint's management regarding business model, operations, and forecasts; and financial and valuation analysis of ChargePoint and the Proposed Merger.

37. Further, the Proxy states that given the absence of a public trading market for ChargePoint common stock, ChargePoint management performed multiple valuation analyses to determine its fair value, including a discounted cash flow analysis and a selected comparable companies analysis.

38. However, none of these analyses described in the Proxy are disclosed to shareholders. Shareholders are entitled to a fair summary of valuation analyses performed in support of a proposed merger. Such information is plainly material to Switchback shareholders and strikes at the heart of the decision they are being asked to make regarding the Proposed Merger. The failure to include this material valuation information in the Proxy renders the description provided therein misleadingly incomplete.

    C.    <u>The Misleadingly Incomplete Financial Projections</u>

39. The Proxy omits critical financial projections for ChargePoint, including

income/loss projections and free cash flow projections, both of which existed and were readily available to be disclosed (together the "Omitted Projections"). Defendants elected to summarize ChargePoint's financial projections, but they excised and failed to disclose the Omitted Projections. By disclosing certain projections in the Proxy and withholding the Omitted Projections, Defendants render the table of projections on page 129 of the Proxy materially incomplete and provide a misleading valuation picture of ChargePoint.

40. There are significant differences between cash flow projections—widely recognized as the most important valuation metric when it comes to valuing a company and its stock—and the EBITDA projections that are included in the Proxy. EBITDA projection metrics are not sufficient analogs for cash flow projections. Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected EBITDA.[1] As Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[2] Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[3] As a result of these material differences between EBITDA and cash flows, experts recognize cash flows as a much more

---

[1] Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." Cost of Capital. 16. ("Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter…").

[2] Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[3] Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/

accurate measure when it comes to analyzing the expected performance of a company.

41. In light of the significant differences between the Omitted Projections and the figures disclosed in the Proxy, the table of projections on page 129 of the Proxy is misleadingly incomplete. By failing to include the Omitted Projections, the table provides a materially incomplete and misleading overall valuation picture of ChargePoint. Simply put, net income and cash flow projections are irreplaceable when it comes to fully and fairly understanding a company's projections and value.

42. Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of ChargePoint's projections but failed to disclose the Omitted Projections. This omission renders the summary of the projections table, ChargePoint's financial picture, and the recommendation of the Board provided in the Proxy misleadingly incomplete.

   D.   <u>The Misleadingly Incomplete Background of the Proposed Merger</u>

43. The Proxy contains a misleadingly incomplete summary of the events leading up to the Proposed Merger that omits material facts. Once a company travels down the road of partial disclosure of the history leading up to a merger, they had an obligation to provide shareholders with an accurate, full, and fair characterization of those historic events. Even a non-material fact can trigger an obligation to disclose additional, otherwise non-material facts in order to prevent

the initial disclosure from materially misleading the stockholders.

44. The Proxy states that Switchback entered into confidentiality agreements with four potential acquisition targets in the oil and natural gas minerals and royalty interests business sector and eight confidentiality agreements targets engaged in businesses involving energy sustainability or utilizing disruptive energy technologies. However, the Proxy fails to disclose whether such agreements contained a standstill and/or "don't ask don't waive" ("DADW") provision, including whether those provisions had fallen away upon the execution of the Merger Agreement or were still in effect.

45. The express communication of the existence of these provisions is material to Switchback shareholders, as it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal. The failure to plainly disclose the existence of DADW provisions creates the false impression that any of the parties who signed non-disclosure agreements could have made a superior proposal. However, if those non-disclosure agreements contained DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this material information renders the description of the non-disclosure agreements the Company entered into in the Background of the Merger section of the Proxy misleading. Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information

46. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act and the Individual Defendants' duty of candor/disclosure. Absent disclosure of the foregoing material information

prior to the forthcoming Shareholder Vote, Plaintiff will be unable to cast an informed vote regarding the Proposed Merger, and is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act

47.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

48.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

49.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

50.     The omission of information from a proxy will violate Section 14(a) if other SEC regulations specifically require disclosure of the omitted information.

51.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Merger.  Each of the Individual Defendants

reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the financial advisors conflicts; (ii) the valuation analyses; (iii) ChargePoint's financial projections and valuation; and (iv) the confidentiality agreements.

52.     In so doing, Defendants made misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

53.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that the financial advisors reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided them.  Further, the Individual Defendants were privy to and had knowledge of the financial projections and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material

misstatements or omissions.

54. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement.

55. Switchback is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

56. The misrepresentations and omissions in the Proxy are material and Plaintiff will be deprived of his right to cast an informed vote on the Proposed Merger if such misrepresentations and omissions are not corrected prior to the special meeting of Switchback's shareholders. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

57. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58. The Individual Defendants acted as controlling persons of Switchback within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's

operations and/or knowledge of the misleadingly incomplete statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the material statements that Plaintiff contends are incomplete and misleading.

59. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

61. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

62. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

63. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by

their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

64. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty of Candor/Disclosure

65. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66. By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff and all Company shareholders a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

67. As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving or causing the materially deficient Proxy to be disseminated to Plaintiff and the Company's other public shareholders.

68. The misrepresentations and omissions in the Proxy are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

69. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's

equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the special meeting of Switchback shareholders to vote on the Proposed Merger or consummating the Proposed Merger, until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 15, 2020                **MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
John Baylet (JB-6725)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
          jbaylet@monteverdelaw.com

*Attorneys for Plaintiff*